UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
SEAN JOHNSON,

    Plaintiff,

vs.

CH ENERGY GROUP, INC.

    Defendant.
-------------------------------------------------x

COMPLAINT

**06 CIV. 5272**

**ROBINSON**

Plaintiff, Sean Johnson, by and through Michael H. Sussman, his attorney, hereby alleges as against the defendant:

I. **PARTIES**

1. Sean Johnson, plaintiff, is an African-American male of legal age who resides within this judicial district.

2. CH Energy Group, Inc., defendant, operates Central Hudson, plaintiff's employer, in this judicial district. It employs more than 20 persons and may sue and be sued in this court.

II. **JURISDICTION**

3. As plaintiff alleges that defendant violated rights guaranteed by federal law in this judicial district, this Honorable Court has jurisdiction pursuant to 28 U.S.C. secs. 1331 and 1343 (3) & (4) as well as 42 U.S.C. sec. 1988. As plaintiff

1

contends that defendant violated section 296 of the New York State Executive Law within the last three years and the underlying facts showing that such violations arise from the same nucleus of operative facts as the federal claims, this Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. sec. 1367.

### III. **FACTUAL ALLEGATIONS**

4. Plaintiff has worked for defendant for nearly 16 years.

5. In October 2002, defendant promoted plaintiff to the position of Lineman 2nd Class.

6. In March 2005, plaintiff failed the promotional exam for Lineman 1st Class.

7. Thereafter, plaintiff made numerous inquiries of his supervisors concerning his progress at mastering skills necessary to gain promotion to Lineman 1st Class..

8. In response, plaintiff's white supervisors provided him very little guidance or instruction.

9. In July 2005, plaintiff's working foreman Teddy Bickert, who is white, told Johnson that he might be transferred to another district for training.

10. Later, in July 2005, another working foreman, David Warren, who is

also white, belittled plaintiff in front of other workers after Johnson had again asked him for feedback as to how he was progressing.

11. On July 18, 2005, defendant transferred plaintiff to Kingston, where he was the only African-American lineman.

12. In September 2005, Wayne Rice, another white working foreman, told plaintiff that he had "snowed" everyone in Kingston and that he had seen "right through him."

13. When plaintiff reported this to another white working foreman, Comosa, the latter man indicated that these and other hostile comments from Rice represented plaintiff's initiation.

14. After learning that plaintiff had complained to Comosa, Rice continued to be nasty to the plaintiff and disallowed him from performing tasks associated with his Lineman 2nd title.

15. Such treatment caused plaintiff to speak with Rice again, explain some of the racially adverse treatment Johnson had previously endured while employed by defendant and ask his white supervisor to desist from like conduct.

16. Thereafter, Rice continued mistreating plaintiff.

17. On October 27, 2005, plaintiff handed Rice some rope and asked him to perform a work-related function; Rice responded that "maybe he would make a

3

noose."

18. Rice made this remark in the presence of Comosa, another supervisor.

19. On October 31, 2005, plaintiff told foreman supervisor Richard Davis and Shop Steward Bob Elliott, who are both Caucasian, about Rice's comment.

20. Davis told plaintiff that Rice made a poor choice of words, but was not a racist, "just breaking your balls."

21. Davis asked plaintiff to keep the situation between themselves and not further disclose Rice's comment.

22. Plaintiff agreed in exchange for being taken off of Rice's crew.

23. The following day, plaintiff asked Davis if he had spoken with Rice.

24. Davis replied that he had and that Rice had told him, "maybe I said it, maybe I didn't."

25. Plaintiff was maintained on Rice's crew.

26. On November 2005, after learning that Warren was going to be a proctor on his promotional examination, plaintiff told Elliott that he was uncomfortable with this assignment because of Warren's prior conduct.

27. On November 9, Tom Brock, Assistant Vice President of defendant's Human Resources Department, called plaintiff at home and questioned him about Rice's "noose" comment.

28. Plaintiff confirmed Rice's several insulting and hostile comments, including this one.

29. Brock advised plaintiff to call him if there were any additional incidents.

30. Within a week, defendant commenced a series of "ethics meetings" to discuss how to treat employees.

31. Starting on November 15, 2005, plaintiff noticed that two service workers with whom he had cordial relations became abrupt toward him and avoided speaking with him.

32. While defendant exposed each worker to training in diversity, on the ground, these employees were ignoring and avoiding plaintiff, the sole African-American lineman in Kingston.

33. Comosa witnessed the hostile environment to which his workers subjected plaintiff but took no action.

34. In February 2006, after plaintiff again complained about the prospect of Warren serving as a proctor during his promotional exam, Elliott, another proctor with whom plaintiff had a respectful and positive relationship, insured him that he would go up in the bucket as a proctor.

35. On February 15, plaintiff took and passed the written and verbal

y

elements of the promotional examination.

36. On February 16, 2006, plaintiff took the practical component of the promotional exam.

37. Warren went up with plaintiff in the bucket and, contrary to protocol, made verbal comments during the test.

38. Most critically, after the examination, Warren falsely accused plaintiff of removing one of his safety gloves during the examination.

39. On Friday, February 17, 2006, defendant's Supervisor of Management Foremen, Neil Moriarty, advised plaintiff that he had been failed on the promotional examination because the proctors reported that he had removed one of his rubber gloves to install a nut on the cut-out.

40. Plaintiff immediately denied this becoming quite upset over the claim.

41. Elliott supported plaintiff's denial and indicated he did not see plaintiff take his glove off at any time during the examination.

42. Moriarty then called a third proctor, Mike Lennon, who also supported plaintiff's account.

43. The following day, Elliott called plaintiff and told him he had received a nearly perfect score [69 of 70] on the written and verbal portions of the promotional test.

44. Elliott further advised plaintiff that he had done enough to be promoted.

45. Elliott further reported that when the proctors met together, he felt pressure to fail plaintiff.

46. During the following days, plaintiff had several contacts with the union president, Maher.

47. Maher expressed anger toward Johnson for bothering Elliott, told plaintiff that the decision of the proctors was final and suggested that the two proctors who said they did not see plaintiff remove his glove could not see from the ground what plaintiff had done.

48. On February 21, 2006, plaintiff met with Brock who advised him to drop the matter and claimed that the company had some unspecified system for resolving disputes between proctors, though he denied any such dispute existed concerning the results of Johnson's test.

49. During these conversations, Maher and Brock worked in concert to minimize the dispute as to whether plaintiff passed the practical aspect of the examination and told plaintiff that there was nothing he could do about the proctors' decision.

50. During his discussion with Maher and Brock, plaintiff explained that the entire test was conducted in an improper manner, with ad hoc changes in the

tasks required; in fact, the testing protocol and required tasks are normally agreed to in advance, though that was not done in this instance.

51. On February 27, 2006, Brock, Maher, Mary Decker, Barry Bloom and plaintiff met.

52. Brock complained that plaintiff was permitted one union representative and initially caused Maher to wait in the hallway.

53. Brock then changed his mind and allowed Maher and Decker to attend the meeting.

54. At the meeting, Brock claimed that the four proctors had met and decided that plaintiff did not demonstrate the skills and competencies needed to be promoted to Lineman 1st class.

55. At the meeting, Brock indicated that plaintiff was failed not merely because he took off a safety glove.

56. The account Brock provided of what happened during the practical test was fundamentally false and exaggerated in a manner contrary to plaintiff's interests.

57. Effective February 21, 2006, defendant demoted plaintiff to the position of meter reader.

58. In the meantime, plaintiff was taken to the emergency room for stress

and anxiety and hospitalized for two days.

59. By dint of the failure to promote plaintiff and his related demotion, defendant caused Johnson [a] loss of income and future income; [b] loss of future retirement benefits; [c] mental stress, anxiety, embarrassment and humiliation and [d] frustrated his ambition to gain further promotion with the company.

60. Defendant treated plaintiff in a disparate manner than the way is has treated similarly-situated whites who sought promotion to Lineman 1st Class.

61. Defendant's white proctors did not fabricate false reasons to "fail" such white candidates for promotion.

62. Defendant's actions and omissions, as relevant to the failed promotion and demotion, were intentional and racially motivated.

## IV. **CAUSES OF ACTION**

63. Plaintiff incorporates paras. 1-62 as if fully re-written herein.

64. By intentionally discriminating against plaintiff on the basis of his race when it failed to promote and then demoted plaintiff, defendant violated 42 U.S.C. secs. 1981-a, as amended.

65. By intentionally discriminating against plaintiff on the basis of his race when it failed to promote and then demoted plaintiff, defendant violated section 296 of the Executive Law of the State of New York.

## V. **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that:

a) this Honorable Court accept jurisdiction over this action;

b) empanel a jury to hear and decide this matter;

c) award to plaintiff and against defendant compensatory and punitive damages, with pre and post-judgment interest as permitted by law;

d) award to plaintiff and against defendant the reasonably incurred attorneys fees and costs of this matter;

e) order defendant to permit plaintiff to re-take the practical portion of Lineman 1st class test under fair and equitable conditions and

f) enter any other order it deems required and in the interests of equity and law.

Respectfully submitted,

MICHAEL H. SUSSMAN [3497]

LAW OFFICES OF MICHAEL H. SUSSMAN
PO Box 1005
Goshen, NY 10924
(845)-294-3991

Counsel for Plaintiff

Dated: July 11, 2006