UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
One North Broadway, Suite 1502
White Plains, New York   10601
(914) 328-0404
Counsel for Defendant:
      Joseph A. Saccomano, Jr. (JS 7504)
      Susanne Kantor (SK 8278)

-------------------------------------------------------------------X

SEAN JOHNSON,

                    Plaintiff,

    - against -

CH ENERGY GROUP, INC.,

                    Defendant.

-----------------------------------------------------------X

06 CIV.  5272 (CLB) (MDF)

**DEFENDANT'S LOCAL RULE
56.1 STATEMENT OF
MATERIAL FACTS NOT IN
DISPUTE**

Defendant CH Energy Group, Inc., ("Defendant"), by and through its attorneys,

Jackson Lewis LLP, respectfully submits this Local Rule 56.1 Statement of Material Facts as to

which there is no genuine issue to be tried in support of Defendant's Motion for Summary

Judgment.

I.      **BACKGROUND OF PLAINTIFF'S EMPLOYMENT HISTORY WITH CHG&E.**[1]

          1.     Central Hudson Gas & Electric Corporation ("CHG&E" or "the

Company") is a subsidiary of CH Energy Group, Inc. (Saccomano Aff. ¶ 2).

---

[1]    These facts are assumed true for purposes of the instant motion only. References to the relevant
transcript pages of the first day of Plaintiff's deposition are abbreviated herein as "Pl. Dep. __."
References to the relevant transcript pages of the second day of Plaintiff deposition are abbreviated
herein as "Pl. Dep. II __." Copies of all pages of transcript and exhibits cited herein and in
Defendant's Memorandum of Law are attached to the Saccomano Affirmation submitted in support of
Defendant's motion.

2.　　　Plaintiff began his employment with CHG & E on October 25, 1990. (Pl. Dep. 52, 59; Saccomano Aff. Ex. J[2]).

3.　　　Plaintiff was hired as a part-time Cleaning Worker (Pl. Dep. 52, 59; Saccomano Aff. Ex. J).

4.　　　Plaintiff learned about the availability of a position with CHG&E from his mother, who was employed with the Company as an Accounting Technician until her retirement. (Pl. Dep. 64-67).

5.　　　Plaintiff's aunt and a cousin have also worked for CHG&E. (Pl. Dep. 64-67).

6.　　　In February 1993, Plaintiff was hired into the full-time position of Production Plant Cleaner. (Pl. Dep. 59, 69; Saccomano Aff. Ex. J).

7.　　　The terms and conditions of Plaintiff's full-time positions with CHG&E, including his wages and benefits, are covered by a collective bargaining agreement ("CBA") between the International Brotherhood of Electrical Workers, Local 320 ("Union") and CHG&E. (Pl. Dep. 69-71; Pl. Dep. II 34-35).

8.　　　In January 1995, Plaintiff took a promotional examination and was promoted to the position of Maintenance Worker 2nd Class. (Pl. Dep. 72; Saccomano Aff. Ex. J).

9.　　　In December 1997, Plaintiff took a promotional examination and was promoted into the position of Commercial Representative Junior Meter Reader. (Pl. Dep. 74; Saccomano Aff. Ex. J). Later, he was promoted to Commercial Representative Meter Reader. (Saccomano Aff. Ex. J).

10.　　Plaintiff worked as a Commercial Representative Meter Reader until March of 2001. (Pl. Dep. 77; Saccomano Aff. Ex. J).

---

[2]　A true and correct copy of Plaintiff's work history marked as Exhibit 2 at the deposition of Plaintiff is annexed to the Saccomano Affirmation as Exhibit J.

11.     While he was a Meter Reader, Plaintiff's picture was chosen to appear on a notice that was mailed to CHG&E customers explaining how customers can properly identify/verify CHG&E employees if/when CHG&E employees come to customers' homes. (Pl. Dep. 96-98; Saccomano Aff. Ex. K[3]).

12.     From August 1992 through December 2005, Plaintiff filed at least nine (9) workplace injury/accident reports with the Company detailing instances wherein he had injured himself while working. (Pl. Dep. 100-22).

13.     With respect to these injury reports, Plaintiff admits that many of these accidents could have been prevented if Plaintiff had been more careful and more observant. (Pl. Dep. 120-21).

## II.     PLAINTIFF'S PROGRESSION THROUGH THE LINEMAN SERIES.

14.     In March 2001, Plaintiff had enough seniority to take the promotional examination and was promoted to the position of Lineman 3rd Class. That position is the first position within the Lineman series. (Pl. Dep. 77-78; Saccomano Aff. Ex. J).

15.     Under the CBA, the position of Lineman is in a "progression" series which encompasses the positions of Lineman 3rd Class, Lineman 2nd Class (Service Worker B), and Lineman 1st Class (Service Worker A). (Pl. Dep. 79-80; Brocks Dep. 11).

16.     The positions within the Lineman progression involve working with live high voltage power lines and heavy equipment. (Pl. Dep. 92, 119).

17.     Whenever a Lineman is out of his/her truck and in proximity to the high voltage power lines, the Lineman must wear their protective safety gear, including their rubber gloves. (Pl. Dep. 93-94).

---

[3]     A true and correct copy of the customer notice produced by Plaintiff to Defendant and marked at Plaintiff's deposition as Exhibit 4 is annexed to the Saccomano Affirmation as Exhibit K.

18.    The high voltage associated with these power lines can be lethal.  (Pl. Dep. 95).

19.    As a result, it is extremely important for Lineman to follow safety rules at all times (Pl. Dep. 94-96).

20.    A Lineman removing his/her safety glove for any reason would be a serious breach of safety procedures.  (Pl. Dep. 131).

21.    Pursuant to the provisions of the CBA, an employee must pass successive tests for Lineman 2nd Class (Service Worker B) and Lineman 1st Class (Service Worker A) within a specific amount of time and number of attempts or the employee is returned to his former position from which he entered the progression series.  (Pl. Dep. 83; Pl. Dep. II 8-9; Brocks Dep. 29; Saccomano Aff. Ex. T[4]).

22.    Not all positions are in a progression series.  (Pl. Dep. II 9).

23.    After participating in Company training to become a Lineman, Plaintiff took a written and practical examination to proceed to the second position in the Lineman progression.  He passed the examination and was promoted to the position of Lineman 2nd Class (Service Worker B).  (Pl. Dep. 80-82).

24.    Plaintiff believes the training he received from the Company to progress from: (a) meter reader to Lineman 3rd Class; and (b) Lineman 3rd Class to Service Worker B, was sufficient.  (Pl. Dep. 132).

25.    In March, 2005, after training for 30 months as a Lineman 2nd Class (Service Worker B), Plaintiff took the Lineman 1st Class (Service Worker A) qualifying examination for the first time.  (Pl. Dep. 33, 89).

---

[4]    A true and correct copy of the investigation summary prepared by Barry Bloom, Director of Corporate Compliance and Regulatory Training, produced by Defendant to Plaintiff during discovery at Bate stamps 1450-52, is annexed to the Saccomano Aff. as Ex. T.

26.    To be promoted to Lineman 1st Class (Service Worker A), the candidate is required to take a written examination and to demonstrate certain procedures "up in the air" on the pole as part of the practical portion of the examination. (Elliott Dep. 18-19).

27.    There are four proctors for the Lineman 1st Class (Service Worker A) qualifying examination.  Two of the proctors are designated by the Company.  Two of the proctors are designated by the Union. (Pl. Dep. 161-62).

28.    Pursuant to the CBA, the proctors develop and administer the written and practical portions of the test. (Elliott Dep. 19-20).

29.    The written examination is comprised of basic questions regarding, among other things, line work, transformers, and safety procedures. (Elliott Dep. 19).

30.    Pursuant to Exhibit 15 to the CBA, the findings of the proctors during a progression qualifying examination are final. (Bloom Dep. 28, 42-43; Maher Dep. 27).

31.    One of the proctors designated by the Company during Plaintiff's first attempt at the Lineman 1st Class (Service Worker A) examination was Michael Englishby, a supervisor/foreman. (Pl. Dep. 54, 190).

32.    During the de-energized practical demonstration of the examination, Plaintiff made contact with the high voltage primary conductor. (Brocks Dep. 36).

33.    The proctors appropriately failed Plaintiff because of this mistake. (Pl. Dep. 185).

34.    Other individuals who took the test during the same time period as Plaintiff also failed the Lineman 1st Class (Service Worker A) examination on their first attempt, including John Schueren and Scott Parker. (Pl. Dep. 185-86).

35. Plaintiff does not believe there was anything discriminatory about the administering or scoring of the first Lineman 1st Class (Service Worker A) examination that he took and did not pass. (Pl. Dep. 186).

36. After he failed his first attempt at the Lineman 1st Class (Service Worker A) examination, one of the proctors, Mr. Englishby (Caucasian), informed Plaintiff about certain things he did incorrectly on the examination where Plaintiff lost points. (Pl. Dep. 54-55; 303).

37. Mr. Englishby conducted tutorials with Plaintiff to prepare him to take the examination again and to assist him with his training to become a Lineman 1st Class (Service Worker A). (Pl. Dep. 54-55; 303).

38. Plaintiff believes these tutorials helped his performance on his second attempt at the Lineman 1st Class (Service Worker A) examination. (Pl. Dep. 56).

39. Thereafter, Plaintiff was transferred from the Poughkeepsie site to the Kingston site for additional training. (Pl. Dep. 191-92; Brocks Dep. 16; Elliott Dep. 13-14).

40. Plaintiff was in favor of the transfer to Kingston. (Pl. Dep. 191-92).

41. While in Kingston, Plaintiff worked under Bob Elliott, a working foreman, second-class. (Pl. Dep. 194).

42. Plaintiff testified that Bob Elliott (1) took Plaintiff "under his wing," and (2) was a "real cool guy" who was "easy to get along with" and has a "very trusting personality." (Pl. Dep. 317-18).

43. Plaintiff performed a lot of "overhead" line work with Bob Elliott in training to become a Lineman 1st Class (Service Worker A). (Pl. Dep. 194).

44. Plaintiff trusts Bob Elliott. (Pl. Dep. 168).

45. In accordance with the CBA, Plaintiff and the other individuals employed in the position of Service Worker B who failed their first attempt at the Lineman 1st Class

(Service Worker A) examination were entitled to one additional opportunity to qualify for the Lineman 1st Class (Service Worker A) position.  Article IV-J, paragraph 6 of the CBA provides in relevant part:

> *Employees who are on automatic progression at the second-class level and who fail to qualify for a first-class rating will be given one additional opportunity to qualify.  The second qualifying examination will be given at the option of the Company any time between six months and one year following the first examination. If such employee fails the second time, such employee will be returned to the job classification, pay group and pay step which such employee held before entering the program and will be ineligible for future training in the craft in which such employee failed to qualify.*

(See Saccomano Aff. Ex. M).[5]

46.    The Company elected to test Plaintiff, John Schueren and Scott Parker after one year, to give them the full benefit of a longer training period to prepare them to qualify and progress to Lineman 1st Class (Service Worker A).  (See Saccomano Aff. Ex. T).

47.    The proctors for this qualifying examination were four different individuals from the proctors for the first examination Plaintiff took and consisted of: (1) Company-designated proctors Jay Deyo and Michael Lennon, Line Foremen, and (2) Union-designated proctors Robert Elliott and Dave Warren, Working Foremen 2nd Class (LES&T).  (Pl. Dep. 161-62; Maher Dep. 14).

48.    On February 16, 2006, Plaintiff, John Schueren, and Scott Parker were tested again for the Lineman 1st Class (Service Worker A) position.  (Pl. Dep. 42).

49.    The written portion of the February 2006 examination, which includes a short verbal portion, contained the same questions as the written examination given to the candidates in March 2005.  (Pl. Dep. 179-80, 269-73).

---

[5]    The relevant portions of the Collective Bargaining Agreement cited herein and in Defendant's Memorandum of Law are annexed to the Saccomano Affirmation as Exhibit M.

50.     The proctors knew that these three individuals had failed the Lineman 1st Class (Service Worker A) examination the prior year when the proctors developed the examination to be administered in February 2006. (Lennon Dep. 19-20).

51.     The proctors chose the same written examination questions for the February 2006 examination so as to not overwhelm the candidates on their second attempt at the Lineman 1st Class (Service Worker A) test. (Deyo Dep. 87).

52.     Plaintiff scored very high on the written/verbal portion of the February 2006 Lineman 1st Class (Service Worker A) examination. (Pl. Dep. 215).

53.     Plaintiff believed it was fortunate that the proctors administered the same written test in February 2006 that he took the year before. (Pl. Dep. 180).

54.     Each of the proctors did not observe Plaintiff for the entire practical examination, without interruption, because they were each performing different tasks and getting equipment to assist Plaintiff during the test. (Lennon Dep. 30-36; Elliott Dep. 26).

55.     During Plaintiff's practical demonstration, the four proctors were positioned at different vantage points during the course of the examination. (Pl. Dep. 175-76).

56.     For part of the demonstration, Union-designated proctor Dave Warren was up in the air with Plaintiff in the bucket of the bucket truck. (Pl. Dep. 175).

57.     While up on the pole, Plaintiff dropped two nuts used to fasten certain equipment or materials to the pole. (Pl. Dep. 122-23, 172-73).

58.     Plaintiff used profanity during the practical portion of the examination, loud enough for all four proctors to hear him while they were on the ground and Plaintiff was up on the pole. (Pl. Dep. 172-73).

8

59.     Plaintiff also performed a "short-cut" procedure when he performed one of the required tasks that he admits "might not have been right, but it seemed logical that it would work." (Pl. Dep. 179).

60.     With respect to this short-cut procedure that Plaintiff performed during the examination, Bob Elliott told Plaintiff: "That's not the way we do it." (Pl. Dep. 180).

61.     After he completed the practical demonstration and came down from the pole, Plaintiff stated to Bob Elliott: "I didn't do too well, did I?" (Pl. Dep. 197).

62.     According to the assessment of the four proctors, Parker and Schueren passed the qualifying examination. (Elliott Dep. 56; Deyo Dep. 83; Saccomano Aff. Ex. T).

63.     Parker is African-American; Schueren is Caucasian. (Pl. Dep. 42).

64.     Plaintiff did not personally observe either Schueren's, or Parker's practical examinations. (Pl. Dep. 43).

65.     The unanimous decision of the proctors was that Plaintiff did not pass the February 2006 Lineman 1st Class (Service Worker A) examination. (Elliott Dep. 61-62; Saccomano Aff. Exs. Q, T).

66.     According to Union-designated proctor Bob Elliott, who has been employed by CHG&E for 39 years and has proctored approximately 10 promotion exams, Plaintiff appeared very "flustered" during the practical demonstration by the way he was moving and positioning himself up on the pole. (Elliott Dep. 6, 31-32, 35-36).

67.     Elliott was very upset watching Plaintiff's performance during the practical examination because Elliott had "worked very hard to try to train" Plaintiff and had discussed with Plaintiff beforehand what would be on the examination. (Elliott Dep. 32, 61).

68.     Company-designated proctor Michael Lennon, who has been employed by CHG&E for 18 years, observed Plaintiff to be sweating, using profanity, asking questions, and

9

being nervous and hesitant to make decisions during the practical demonstration. (Lennon Dep. 6, 34-39, 50-51).

69.    The day after the practical portion of the examination, Plaintiff was informed he failed the Lineman 1st Class (Service Worker A) examination. Plaintiff was also told that two of the proctors (Company-designated proctor Jay Deyo and Union-designated proctor Dave Warren) saw Plaintiff remove one of his rubber gloves while up on the pole. (Pl. Dep. 121-22, 206-07).

70.    Plaintiff denied removing his rubber glove during the examination and became extremely upset. (Pl. Dep. 207-09).

71.    Elliott gave Plaintiff no points for the practical portion of the examination. (Elliott Dep. 31).

72.    Because he was not observing Plaintiff the entire time he was on the pole, Elliott does not know if Plaintiff removed his glove during the test. (Elliott Dep. 59).

73.    Because he was not observing Plaintiff the entire time he was on the pole, Lennon does not know if Plaintiff removed his glove during the examination. (Lennon Dep. 60-61).

74.    Deyo testified in detail about his observation that Plaintiff removed his rubber glove. (Deyo Dep. 55-59).

75.    Plaintiff did not depose David Warren. Mr. Warren, however, submitted a signed statement to the Company prior to this litigation detailing his observation of Plaintiff removing his rubber glove. (Bloom Dep. 97-99; Saccomano Aff. S[6]).

---

[6]    A true and correct copy of the handwritten statement of Dave Warren received by Mr. Bloom, Bates stamped CHG(Johnson) 0378-0382, marked as Exhibit 9 at the deposition of Mr. Bloom (see Bloom Dep. 97), is annexed to the Saccomano Affirmation as Exhibit S.

76.     Plaintiff met with Union president Frank Maher and Labor Relations Administrator Heather Still regarding the results of the examination. (Pl. Dep. 210-12).

77.     Maher pointed out to Plaintiff that eight proctors - - four from the first examination and four from the second examination - - believed Plaintiff should not be a Lineman. (Pl. Dep. 212-13).

78.     Plaintiff told Maher that Plaintiff believed two of the proctors from the second examination (Deyo and Warren) were lying about seeing Plaintiff remove his glove during the practical demonstration. (Pl. Dep. 213).

79.     Plaintiff was told by Maher to meet with the Company's Human Resources department on February 21, 2006 to discuss the issue. (Pl. Dep. 216).

**III.     THE COMPANY'S INVESTIGATION OF PLAINTIFF'S COMPLAINT THAT THE DECISION REGARDING HIS FAILURE OF THE LINEMAN 1ST CLASS EXAMINATION WAS BASED ON HIS RACE.**

80.     On February 21, 2006, Thomas Brocks, Assistant Vice President-Human Resources, Heather Still, Labor Relations Administrator, and Frank Maher, President IBEW Local 320, met with Plaintiff regarding his failure of the Lineman 1st Class examination and his reassignment to the position of Commercial Representative-Meter Reader by operation of the provisions in the CBA. (Pl. Dep. 225-26; Brocks Dep. 29-30; Saccomano Aff. Ex. O).

81.     Mr. Brocks explained to Plaintiff the proctors' determination that he had failed the qualifying examination and that under the CBA, determinations of the proctors with respect to the results of an examination were final. (Pl. Dep. 226-27; Brocks Dep. 29-30; Saccomano Aff. Ex. O).

82.     During the meeting with Mr. Brocks, Plaintiff stated he was told he failed the examination because he removed one of his protective rubber gloves. (Pl. Dep. 228; Brocks Dep. 30-31)

11

83.     Plaintiff believed two of the proctors (Warren and Deyo) were lying about seeing him remove his glove. (Pl. Dep. 228).

84.     Plaintiff told Mr. Brocks he believed his race was a factor in his receipt of a failing grade on the examination. (Pl. Dep. 228; Brocks Dep. 30-31).

85.     Mr. Brocks informed Plaintiff that if Plaintiff believed the proctors failed him because of his race, the Company would conduct an investigation. (Pl. Dep. 228; Maher Dep. 46).

86.     In the interim, however, because of the provisions of the CBA, Plaintiff had to be returned to his prior position pending the outcome of the Company's investigation into his claim of discrimination. (Pl. Dep. 229).

87.     By the terms of the CBA, since Plaintiff failed his qualifying examination for the second time, he was to be returned to his former position of Commercial Representative-Meter Reader. (Pl. Dep. 239; Brocks Dep. 29; Saccomano Aff. Ex. T).

88.     Under the CBA, his hourly wage was decreased from $30.10 to $26.23. (Pl. Dep. 240).

89.     Mr. Brocks assigned Barry Bloom, Director of Corporate Compliance Training (and former Director of Labor Relations) to conduct a formal investigation into Plaintiff's claim that he failed the examination because of his race. (Pl. Dep 228-32; Brocks Dep. 31; Bloom Dep. 10-11, 17).

90.     Brocks told Bloom to conduct the examination as expeditiously as possible. (Brocks Dep. 34; Bloom Dep. 17).

91.     On that same afternoon (February 21, 2006), Mr. Bloom interviewed Plaintiff with Margaret Sauter (Shop Steward) and Heather Still present, as part of the investigation into Plaintiff's claim of discrimination. (Pl. Dep. 230).

12

92.     During his interview with Mr. Bloom, Plaintiff did not identify any action or conduct on the part of the proctors that was discriminatory.  The information he provided regarding the proctors was that he disagreed with the two proctors who stated they observed him removing his rubber glove while he was in the primary position.  (Pl. Dep. 231; Bloom Dep. 59-62; Saccomano Aff. Ex. P[7]).

93.     Plaintiff told Mr. Bloom he never worked with Mike Lennon or Jay Deyo during his progression training, but had a very good working relationship with Bob Elliott. (Saccomano Aff. Ex. P).

94.     Plaintiff further stated he worked with Dave Warren on occasion while he was assigned to the Poughkeepsie District.  (Pl. Dep. 293-94; Saccomano Aff. Ex P).

95.     Plaintiff told Mr. Bloom that Dave Warren was critical of Plaintiff's work performance in July 2005 and that Warren told Plaintiff that at this stage in Plaintiff's training he should be working more fluidly. (Pl. Dep. 293-94; Saccomano Aff. Ex. P).

96.     Plaintiff did not site any instances of discriminatory behavior involving Mr. Warren.  (Saccomano Aff. Ex. P).

97.     Warren never referred to Plaintiff's race on any occasion.  Warren never made any derogatory comment about Plaintiff's race.  (Pl. Dep. II 13-14).

98.     On February 23, 2006, Mr. Bloom conducted a series of interviews, including individually interviewing all four proctors (Elliott, Lennon, Deyo, and Warren) for Plaintiff's second qualifying examination.  (Bloom Dep. 62. See Saccomano Aff. Ex. Q[8]).

---

[7]   A true and correct copy of the notes of the interview of Plaintiff by Barry Bloom, marked as Exhibit 6 during the deposition of Barry Bloom, are annexed to the Saccomano Affirmation as Exhibit P.
[8]   A true and correct copy of the "Summary of Interviews" prepared by Mr. Bloom, Bates stamped CHG(Johnson) 0370-0376, deemed marked as Exhibit 7 at the deposition of Mr. Bloom (see Bloom Dep. 66), is annexed to the Saccomano Affirmation as Exhibit Q.

13

99.    Mr. Warren gave Mr. Bloom a handwritten statement regarding what occurred during the practical portion of Plaintiff's second examination. (Bloom Dep. 97-99. See Saccomano Aff. Ex. S).

100.    In his handwritten statement, Mr. Warren stated that Plaintiff exhibited frustration and desperation during the practical demonstration, in contrast to Scott Parker and John Schueren, who both exhibited confidence and competence in performing their tasks. (Saccomano Aff. Ex. S).

101.    All four proctors informed Mr. Bloom that Plaintiff's performance during the practical examination demonstrated a lack of skills and abilities to perform line work safely. (Saccomano Aff. Exs. S and T; Elliott Dep. 39-40, 61-62; Deyo Dep. 39, 51; Lennon Dep. 50-51, 59-60, 68-69).

102.    Two of the proctors (Dave Warren and Jay Deyo) told Mr. Bloom that they had observed Plaintiff remove his rubber glove in the primary position. (Saccomano Aff. Exs. S and T).

103.    In addition, according to the proctors, during the practical examination, Plaintiff asked the proctors numerous questions about how to perform certain tasks which, according to the proctors, displayed a lack of line knowledge and the confidence required of a Lineman 1st Class (Service Worker A). (Lennon Dep. 50-51; Saccomano Aff. Ex. T).

104.    The proctors told Mr. Bloom that they unanimously determined that Plaintiff did not demonstrate the skills/abilities or confidence necessary to progress to a Lineman 1st Class (Service Worker A). (Elliott Dep. 61-62. See Saccomano Aff. Ex. T).

105.    Based on this investigation, Mr. Bloom found no evidence to support Plaintiff's claim of racial discrimination. (Saccomano Aff. Ex. T).

106.    Mr. Bloom reported his findings to Mr. Brocks. (Bloom Dep. 100-01).

107.    On February 27, 2006, a meeting was conducted with Plaintiff, Mr. Brocks, Mr. Bloom, Mr. Maher (Union president), and Mary Decker (Union representative) to inform Plaintiff of the results of the investigation.  (Brocks Dep. 40-41; Pl. Dep. 232-33.  See Saccomano Aff. Ex. R[9]).

108.    Mr. Brocks told Plaintiff that the Company's investigation revealed that Plaintiff failed the Lineman 1st Class examination because of his demonstration and not because of his race.  (Pl. Dep. 233; Saccomano Aff. Ex. R).

109.    Mr. Brocks further informed Plaintiff that the proctors stated that Plaintiff demonstrated a lack of skills and abilities to be promoted to Lineman 1st Class (Service Worker A), was nervous up on the pole, and continually asked them questions during the examination. (Pl. Dep. 233-34; Saccomano Aff. Ex. R).

110.    When Plaintiff asked Mr. Brocks what the investigation had revealed with respect to the issue of removing his glove, Mr. Brocks informed Plaintiff that two of the proctors stated during their investigation interviews that they observed Plaintiff remove his glove during the examination. (Saccomano Aff. Ex. R).

111.    Mr. Brocks also told Plaintiff he expected there to be numerous vacant positions with the Company in the near future that would be promotions for Plaintiff and encouraged Plaintiff to take the qualifying examinations for these positions. (Pl. Dep. 237-38; Maher Dep. 36-37; Saccomano Aff. Ex. R).

112.    Available positions within the Company are posted on the Company's bulletin boards. (Pl. Dep. II 11).

---

[9]    A true and correct copy of the February 27, 2006 File Memo prepared by Mr. Bloom, Bates stamped CHG(Johnson) 0377, marked as Exhibit 8 at the deposition of Mr. Bloom (see Bloom Dep. 97), is annexed to the Saccomano Affirmation as Exhibit R.

113.    Since failing the Lineman 1st Class examination in February 2006, Plaintiff has not pursued any other position or promotional opportunity with CHG&E. (Pl. Dep. 238).

114.    Plaintiff is not interested in any other position with the Company other than Lineman 1st Class (Service Worker A). (Pl. Dep. 239).

115.    Plaintiff is currently employed in the position of Commercial Representative Meter Reader. (Pl. Dep. II 6).

116.    As a meter reader, Plaintiff has more interaction with customers than he would have had as a Lineman. (Pl. Dep. II 17).

117.    Plaintiff has a good relationship with his current supervisor, Kevin Smith. (Pl. Dep. 25; Pl. Dep. II 55).

118.    Since February 2006 when he learned he failed the Lineman 1st Class examination, nothing else has happened to Plaintiff at CHG&E that he believes to be discriminatory. (Pl. Dep. II 55).

## IV.    PLAINTIFF HAD EFFECTIVE AVENUES AVAILABLE TO HIM FOR MAKING A COMPLAINT OF PERCEIVED DISCRIMINATION.

119.    Plaintiff received a copy of the Company's Employee Handbook which contains policies and procedures for employees to follow if they believe they have been subjected to discrimination (Pl. Dep. 137-38; Pl. Dep. Ex. 15[10]).

120.    The Company also has policies posted on bulletin boards throughout its facilities of which Plaintiff is aware. (Pl. Dep. 138).

---

[10]    A true and correct copy of the relevant portions of the Company's employee handbook marked at Plaintiff's deposition as Exhibit 15 is annexed to the Saccomano Affirmation as Exhibit L.

121.    Plaintiff attended a company-wide training seminar in November 2004 entitled "Welcoming Diversity & Maintaining A Harassment-Free Workplace." (Pl. Dep. 251-53).

122.    In addition to Company policies and training, there are provisions in the CBA governing the terms and conditions of Plaintiff's employment that Plaintiff could utilize to complain of unfair treatment. (Maher Dep. 58-59).

123.    Plaintiff never complained to his Union about any perceived discrimination and/or improper/insufficient training. (Maher Dep. 11, 59).

Respectfully submitted,

JACKSON LEWIS LLP
One North Broadway, Suite 1502
White Plains, New York 10601
(914) 328-0404

By:    _____
Joseph A. Saccomano, Jr. (JS 7504)
Susanne Kantor (SK 8278)

ATTORNEYS FOR DEFENDANT

Dated:    September 25, 2007
          White Plains, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
One North Broadway, Suite 1502
White Plains, New York   10601
(914) 328-0404
Counsel for Defendant:
      Joseph A. Saccomano, Jr. (JS 7504)
      Susanne Kantor (SK 8278)
-------------------------------------------------------------X

SEAN JOHNSON,

                     **Plaintiff,**              06 CIV.  5272 (CLB) (MDF)

    - against -

CH ENERGY GROUP, INC.,

                     **Defendant.**
-------------------------------------------------------------X

## CERTIFICATE OF SERVICE

      This is to certify that a copy of Defendant's Local Rule 56.1 Statement of Material Facts has been filed via ECF and served via U.S. Mail, First Class this 25th day of September, 2007 on:

Michael H. Sussman, Esq. (MS 3497)
Law Offices of Michael H. Sussman
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991
*Attorneys for Plaintiff*

_____
Joseph A. Saccomano, Jr.